**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ARNAZ PERRY, individually and on** | ) | |
| **behalf of all others similarly situated,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 3:04-0525** |
| **v.** | ) | **Judge Trauger** |
| | ) | **Magistrate Judge Brown** |
| **HOEGANAES CORPORATION,** | ) | |
| | ) | **JURY DEMAND** |
| **Defendant.** | ) | |

**MEMORANDUM**

Pending before the court is the Motion for Summary Judgment (Docket No. 16) filed by

defendant Hoeganaes Corporation ("Hoeganaes"), to which plaintiff Arnaz Perry has responded

(Docket No. 20), and defendant has replied (Docket No. 24). For the reasons expressed herein,

defendant's Motion will be granted.

**Factual Background and Procedural History**[1]

Plaintiff Arnaz Perry is an African-American resident of Gallatin, Tennessee who has

worked for defendant Hoeganaes since February 1997. Hoeganaes is a Delaware corporation

conducting business in Tennessee. As the world's largest steel powder producer, Hoeganaes has

plants in the United States and Europe, including one in Gallatin, Tennessee that it has owned

---

[1]Except as otherwise noted, these facts are drawn from plaintiff's Complaint (Docket No. 1), defendant's Answer (Docket No. 4), and Plaintiff's Response to Defendant's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment (Docket No. 21).

1

since 1979.

Perry started working at Hoeganaes's Gallatin plant in February 1997 as a lab technician, an hourly position. In this position, the plaintiff conducted quality control, running multiple tests on the powder being produced. (Docket No. 19, Record Appendix in Support of Defendant's Motion for Summary Judgment, Exhibit 1, Deposition of R. Arnaz Perry at 15–16.) In late 1997, Perry successfully bid on an open utility operator position in the plant's "melt shop," also an hourly position, pursuant to the bidding procedures outlined in the employee handbook for all open hourly positions, all of which are posted. In his utility operator position, the plaintiff operated cranes, assisted on the atomizing and melt shop decks, and cleaned and repaired ladles. (Docket No. 19, Ex. 1, Perry Dep. at 16.) On March 15, 2001, after an intervening seven- or eight-month period of training to be a furnace operator, Perry successfully bid from his utility operator position into an open ladle operator position in the melt shop, another hourly position. (Docket No. 19, Ex. 1, Perry Dep. at 16–17.) Sometime after he became a ladle operator, he bid on an hourly position in the packing and blending department of the plant, but did not receive the job.

The plaintiff primarily complains of discrimination in the selection and promotion procedures for entry level supervisor jobs. Early in his deposition testimony, the plaintiff asserted that his basis for claiming these procedures are discriminatory is the following: "Number of blacks that have been promoted or not promoted, selection process and the numbers." (Docket No. 19, Ex. 1, Perry Dep. at 25.) The two parties do not agree on the exact number of employees at Hoeganaes or their racial distribution, but their proffered numbers are not far apart. Based on the deposition testimony of the current Human Resources Manager,

David Reeder, the defendant asserts that, between 2003 and 2005, Hoeganaes has employed between 166 and 180 people, 21 to 25 of whom are African-American. (Docket No. 21 ¶ 2.) Based on estimates in his own deposition testimony, the plaintiff asserts that Hoeganaes employs 175 employees at the Gallatin facility, approximately 25 to 30 of whom are African-American (a percentage of between 14.29 and 17.14 percent). *Id.* In his deposition, Reeder estimated that in 2003, there were approximately 13 or 14 entry level supervisors at Hoeganaes. (Docket No. 19, Exhibit 2, Deposition of David A. Reeder at 31.) Prior to May 1, 2003, the only African-American to have held a supervisory position was Charlie Johnson. Johnson had, at one time, been a supervisor in the melt shop area, but was transferred to the position of storeroom coordinator a number of years prior to 2003. *Id.* at 42–43. All persons in the "second-tier" and upper management positions (i.e., those above the entry level supervisors) are white. *Id.* at 32–35, 39.

Prior to May 2003, open entry level supervisory positions, also known as A.O.T. jobs or front line supervisor positions, were not posted.[2] In approximately August or September of

---

[2]Both parties agree that, prior to May 2003, open entry level supervisory positions were not posted. (Docket No. 21 ¶ 10.) However, there is little evidence of what procedure was followed in the selection of supervisors prior to the time that Reeder took over as Human Resources Manager. When asked whether he knew the procedures by which managerial positions were filled from 2000 until his arrival at Hoeganaes in March 2003, Reeder testified that he did not know. (Docket No. 19, Ex. 2, Reeder Dep. at 75.) The plaintiff testified as follows: "Promotion into the entry level supervisory positions, jobs are not posted, just hand-selected. There's no guidelines, no way to compete for those jobs. The competition is limited." (Docket No. 19, Ex. 1, Perry Dep. at 24.) Despite this testimony, the plaintiff would not be in a position to know how the internal promotional decisions were made with respect to non-posted supervisory positions.

2002,[3] Perry approached then-Human Resources Manager Bob Swarda and discussed with him implementing a procedure to ensure that all hourly employees had a chance to compete for front line supervisor positions. (Docket No. 19, Ex. 1, Perry Dep. at 39–40.) The plaintiff testified that both he and Swarda agreed that it would be a good idea to post these entry level supervisory positions so that "everybody could have a chance at them." *Id.* at 40. The plaintiff testified that, at this time, he also expressed his interest to Swarda in any and all A.O.T. jobs that became available. *Id.* at 39. Swarda never implemented a posting procedure for supervisory positions.

Swarda was replaced as Human Resources Manager by David Reeder on March 27, 2003. (Docket No. 19, Exhibit 3, Affidavit of David Reeder ¶ 2.) Reeder testified that, several months after his arrival, he and Perry had a discussion in which Perry asked "did I feel it was strange that there were no more supervisors that were black than what we had," and mentioned that "promotions for, you know, minorities at the plant didn't seem to progress as they should based on the number of minorities they had." (Docket No. 19, Ex. 2, Reeder Dep. at 26, 29.) Perry also expressed to Reeder in general terms that "there had been tension between the blacks and whites at the plant for a number of years," which "sensitized [Reeder] to the fact that the issue may exist" in the facility. *Id.* at 26, 27.

Prior to Reeder's arrival, in March 2003, Hoeganaes promoted a white employee named Chris Glover to the position of maintenance supervisor. Effective May 1, 2003, Richard

---

[3]The plaintiff testified that this conversation occurred about three or four months before Swarda left and approximately six or seven months before the arrival of Swarda's successor. Based solely on the plaintiff's testimony, the defendant estimated this conversation to have occurred in November 2002, but Perry estimates its timing as August or September of 2002. (Docket No. 21 ¶ 12.) Viewing the facts in favor of the plaintiff, the court utilizes the earlier date.

4

Malone, an African-American employee, was promoted from the position of temporary supervisor, a position he had held since October 21, 2002, to supervisor of shipping.[4] Also on May 1, 2003, Reeder posted on six company bulletin boards a "Salaried Exempt Internal Informational Announcement Of 5/1/03," announcing a vacancy in the position of "Supervisor, Melting" and encouraging all qualified employees to submit an application form no later than seven working days from the posting date. (Docket No. 19, Ex. 2, Reeder Dep., Exhibit 4, Salaried Exempt Internal Informational Announcement Of 5/1/03.) Reeder testified that, when he came to Hoeganaes, he decided to initiate this internal posting system, a system he had used before at other facilities, because he felt it would be a positive change to ensure that people knew of opportunities. (Docket No. 19, Ex. 2, Reeder Dep. at 75–76.) As the plaintiff observes in his brief, Reeder testified that no written documents, besides the information posted with the May 1, 2003 job announcement itself, notified employees that this new posting program was being initiated, although Reeder asserts that he discussed the existence of the new program at some departmental meetings at which employees would have been present. *Id.* at 78–80. The plaintiff did not apply for the Supervisor, Melting position, which was awarded to Jeff Meador, a white

---

[4]The plaintiff contends that the promotion of Malone must be viewed against the backdrop of a desk audit of Hoeganaes's affirmative action plan that was conducted by the Office of the Federal Contract Compliance Programs ("OFCCP") and completed on July 21, 2003. (Docket No. 21 ¶ 46.) Hoeganaes maintains contracts with agencies of the federal government and is covered by the provisions of Executive Order 112246, which bans discrimination and requires federal contractors and subcontractors to take affirmative action to ensure equal employment opportunities. *Id.* at ¶ 45. Although OFCCP determined, in its audit, that Hoeganaes's affirmative action plan complied with all applicable affirmative action regulations and that Hoeganaes was in acceptable parameters involving its efforts to recruit, hire, and promote minorities, the plaintiff observes Reeder's acknowledgment in his deposition testimony that, if Malone had not been promoted to supervisor, there would have been no African-American employee holding a supervisory position, and Reeder assumes that Hoeganaes would have fallen into the "underutilized" category in the audit. *Id.* at ¶ 46.

5

employee, in late May 2003. There have been no open front line supervisor positions since Jeff Meador was promoted in late May of 2003. In addition, no front line supervisor positions have been posted pursuant to the announcement program implemented by Reeder subsequent, or prior, to Meador's promotion, although the program still exists. (Docket No. 19, Ex. 2, Reeder Dep. at 89.)

In his Complaint, in addition to all entry level supervisory promotions, the plaintiff alleges that the defendant discriminated against him in particular with respect to other instances of non-selection. The plaintiff alleges that the defendant acted in a discriminatory manner when it promoted a white employee, David Hall, from a brick mason position to a lead person position.[5] Plaintiff alleges that he and other African-Americans were not permitted to apply or compete for the position because it was not posted, even though he allegedly had more seniority than Hall and similar experience in the refractory area. Despite these allegations, the plaintiff admits to the following facts proffered by the defendant. Hoeganaes employs three brick masons to build and brick the ladles used in the steel melting process. Perry has never been a brick mason. In February 2002, the defendant decided to select one of the three brick masons to act as a lead person in the department to coordinate the other employees' schedules. After offering the position to the most senior brick mason, a white employee named Monty Futrell, and being turned down, the defendant offered the position to the next most senior brick mason, an African-American employee named Lonnie Stanton. Stanton accepted the position for a short time

_____

[5]Reeder testified that "leads" are "involved with the coordination of the work flow and production requirements and requisition of supplies and things such as that," are only utilized in some departments, and are directly below front line supervisors in the chain of command, although they are still hourly employees. (Docket No. 19, Ex. 2, Reeder Dep. at 46.)

6

before stepping down.  The defendant then offered the position to the third brick mason, Hall, who has been acting as the lead brick mason since that time.  No other employees other than brick masons were offered this lead person position; however, plaintiff still feels that he should have been offered the position before Stanton or Hall, over whom he has more company-wide seniority.        The plaintiff also alleges in his Complaint that, in late 2002, an opening arose for a supervisory trainee position on the atomizer deck, a position that Perry and other African-American employees were qualified to perform, but one that was not posted.  Plaintiff alleges that this position was ultimately given to a white employee who had less seniority, training, and experience than Perry and the other African-American employees.  Despite these allegations, the plaintiff also admits to the following set of facts proffered by the defendant.  During 2002, the defendant employed three operators on the utility deck, while a fourth atomizer operator was on long-term disability leave.  In late 2002, the fourth atomizer operator unexpectedly returned to work without medical restrictions.  As a result, the least senior atomizer operator, a white employee named Mark Cartwright, was scheduled to be "bumped" out or "demoted" to an atomizer assistant position.  Due to the circumstances surrounding the formerly disabled operator's return to work, the defendant decided to create an ad hoc position of "supervisory trainee" on the atomizer deck to avoid having to "bump out" Cartwright.  The position was not put up to bid for any other employee, white or black.  The defendant's decision to create this position for Cartwright without bidding it resulted in protests from several employees, both black and white.  As a result of the complaints, the defendant reconsidered its decision and decided that it should not have deviated from its workforce reduction policy.  On December 2, 2002, after approximately three weeks in the supervisory trainee position, Cartwright was "bumped out" of

7

the atomizer position and reduced to the position of atomizer assistant, consistent with the workforce reduction policy and with an attendant wage reduction. The defendant eliminated the "supervisory trainee" concept on the atomizer deck, and no one, white or black, was placed into this position that existed for only three weeks.

The plaintiff also complains that, in January 2003, he was not selected to temporarily fill in as a brick mason during a situation in which there was an opening in that position. The parties agree that, in December 2002, two brick masons, Futrell and Stanton discussed above, were placed on light duty due to medical restrictions. The two brick mason assistants, a white employee named Josh Kittrell and an African-American employee named Donnie Adams, temporarily filled in as brick masons while Futrell and Stanton were on light duty. It is undisputed that Perry expressed interest in temporarily filling in as a brick mason during this period and was denied the opportunity, although it is also undisputed that Perry was a ladle operator at the time who had never worked as a brick mason or a brick mason's assistant.

The record contains additional evidence, much of which is undisputed, regarding a variety of other aspects of the plaintiff's employment at Hoeganaes and his original claims. This evidence concerns, for example, the wage rate that was promised Perry in connection with a potential furnace operator position, disciplinary "occurrences" that the plaintiff was given, the administration of a supervisory training program, and Perry's treatment at work during a time when he had temporary medical restrictions. There is also evidence concerning the plaintiff's experience with a number of racially-charged incidents at work, including seeing racially derogatory graffiti in a bathroom, seeing a noose hanging in the plant on two separate occasions during his employment, and seeing a Confederate flag sticker on the hard hat of a white

employee (since removed).  Because, as discussed *infra*, the plaintiff has abandoned the claims with regard to which these facts are relevant, the court does not discuss these underlying facts here.

On June 16, 2004, the plaintiff filed suit in this court alleging discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended in 1972 and 1991, 42 U.S.C. § 2000e *et seq.*; Section One of the Civil Rights Act of 1866, as amended in 1991, 42 U.S.C. § 1981 and § 1981a ("Section 1981); and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.* and Tenn. Code Ann. § 4-21-301 *et seq.*[6]  His allegations were made on behalf of himself and all others similarly situated, and he sought to represent a class defined as "all African-Americans who are or were employed by the Defendant at its Gallatin, Tennessee facility and have been subject to one or more aspects of the systemic racial discrimination described in Counts One and Two" of the Complaint, meaning the defendant's selection and promotional procedures, unequal terms and conditions of employment, racially hostile conditions, and retaliation.  (Docket No. 1 ¶ 18.)  The deadline for plaintiff to file a Motion for Class Certification passed without any such motion by the plaintiff, at which time, upon a motion of the defendant, the court set a schedule for the filing of dispositive motions. (Docket Nos. 14, 15.)  The matter is presently before the court on defendant's Motion for Summary Judgment.

## Discussion

---

[6]Prior to filing suit, the plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission and the Tennessee Human Rights Commission and received a right-to-sue letter.

I.      **Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). In determining whether the moving party has met its burden, the court must view the factual evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). If the nonmoving party, however, fails to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537–38 (6th Cir. 1999).

To preclude summary judgment, the nonmoving party "is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *Gaines v. Runyon*, 107 F.3d 1171, 1174–75 (6th Cir. 1997). "The mere

existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. To determine whether the nonmoving party has raised a genuine issue of material fact, the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his favor. *Id.* at 255.

The court should also consider whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52). "There is no genuine issue for trial unless the nonmoving party has produced enough evidence for a jury to be able to return a verdict for that party." *Tinsley v. Gen. Motors Corp.*, 227 F.3d 700, 703 (6th Cir. 2000). If the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," or enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249–52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citations omitted).


II.     **Analysis**

    A.     <u>Abandoned Claims</u>

    In its Motion for Summary Judgment, the defendant seeks dismissal of multiple claims of

discrimination that were advanced by the plaintiff in his Complaint. The plaintiff fails to defend the bulk of these claims in his Response to Defendant's Motion for Summary Judgment. Specifically, the plaintiff has failed to defend against defendant's Motion for Summary Judgment as to the following claims: (1) discrimination in the administration of the supervisory training program; (2) discrimination in the inclusion of African-Americans on company trips; (3) discrimination in placement on business and planning teams; (4) disparate pay; (5) disparate discipline; (6) discrimination in the handling of work-related injuries and placement on light-duty assignments; (7) any claim of disparate impact in selection and promotion procedures; and (8) racial harassment.[7]

In his brief, the plaintiff implicitly abandons most of these claims by his sheer silence as to their existence, particularly in the face of specific attacks leveled against each of these claims in defendant's brief. In addition, the plaintiff explicitly disavows certain of his claims. For instance, in his deposition the plaintiff admitted that he was never subjected to racial harassment while employed at Hoeganaes.[8] (Docket No. 21 ¶ 74; Docket No. 19, Ex. 1, Perry Dep. at 72.)

---

[7]Perry also fails to address the defendant's assertion that the plaintiff voluntarily limited his claim to non-monetary injunctive relief when he disavowed any claim for monetary relief, including back pay, in his deposition testimony. (Docket No. 17 at 24–25; Docket No. 19, Ex. 1, Perry Dep. at 85.) Because the court grants defendant's Motion for Summary Judgment as to all plaintiff's causes of action, it need not address whether or not the plaintiff voluntarily limited his recovery of damages.

[8]This admission dooms any racial harassment or hostile work environment claim the plaintiff might have had, since a crucial part of any such claim is that the plaintiff must have subjectively perceived his workplace to be abusive. *See Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999). Nevertheless, the court must express its concern with the racially-charged incidents that are apparently not disputed to have occurred at the plant. The court is particularly troubled with the defendant's assertion that "no signs, pictures, illustrations or other information" hung near either of the two nooses that were witnessed at the plant.

12

Also, in his brief, the plaintiff prefaces statistical evidence about the racial distribution of the workforce at the Gallatin plant with the caveat, "[a]lthough this is not a disparate impact case . . . ." (Docket No. 20 at 8.) Moreover, at several points in his brief, the plaintiff refers to his case as if it were purely a failure to promote case. For example, in his introduction (and again in his conclusion), the plaintiff asserts that summary judgment is improper because "genuine issues of material fact exist as to Plaintiff's *promotion claim under a disparate treatment theory*." *Id.* at 1, 11 (emphasis added). The plaintiff's headings announce a "Summary of Perry's Promotion Claim" and "Plaintiff States a Disparate Treatment Promotion Claim," to the exclusion of any other theories of relief. *Id.* at 2, 7. Finally, the plaintiff has not attempted to file any additional briefings, such as a surreply, to respond to defendant's contention in its Reply in Support of Defendant's Motion for Summary Judgment that he has abandoned the bulk of his claims.

Accordingly, for the reasons expressed herein, the court finds that the plaintiff has abandoned the eight claims listed above by his own failure to defend them in his response brief. Summary judgment will be granted as to these claims.


B.      Failure to Promote

Even plaintiff's failure to promote claim poses difficulties to this court because of the plaintiff's failure to specifically identify those specific positions for which he claims he was denied a promotion. The plaintiff contends that "Hoeganaes denied him the opportunity to apply and compete for and [sic] all entry level supervisory positions at the Gallatin facility." (Docket

---

(Docket No. 21 ¶ 77.) No explanation is required to clarify the meaning of such a horrific symbol.

No. 20 at 3.)  Because the plaintiff admits that a four-year statute of limitations governs the case, only those promotions that the plaintiff was denied on or after June 16, 2000 are timely.  In addition, by his language, the plaintiff appears to be complaining only about his failure to be promoted to entry level supervisory positions, but because the defendant addresses three additional instances of non-selection and does not assert in its reply that they have been abandoned, the court addresses these three other positions as well.

A plaintiff bringing a claim of discriminatory treatment under Title VII[9] may pursue such a claim by producing direct evidence of prohibited discrimination or by relying on indirect or circumstantial evidence that would allow an inference of discrimination in accordance with the burden-shifting framework first articulated in *McDonnell Douglas v. Green*.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 514 (6th Cir. 2003).  Both parties agree that the *McDonnell Douglas* framework is the proper method of analysis in this case.  (Docket No. 17 at 4; Docket No. 20 at 7.)  Under this approach, a plaintiff makes out a *prima facie* case of failure to promote by showing that (1) he is member of a protected class;[10] (2) he applied for and was qualified for a promotion; (3) he was considered for and denied a promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied.  *See Nguyen v. City of Cleveland*, 229 F.3d 559, 562–63 (6th Cir.

---

[9]Although the following analysis discusses the disparate treatment claims in terms of Title VII, the analysis is equally applicable to plaintiff's disparate treatment claims under Section 1981 and the THRA, which track the Title VII analysis.  *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001).

[10]There can be no dispute that Perry is a member of a protected class on the basis of his race, African-American.

2000); *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020–21 (6th Cir. 2000); *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1095 (6th Cir. 1996); *Brown v. State of Tenn.*, 693 F.2d 600, 603 (6th Cir. 1982).

Once the plaintiff establishes the *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. *Dews*, 231 F.3d at 1021; *Betkerur*, 78 F.3d at 1095. If the defendant is able to meet its burden, then the plaintiff must be given the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 144 (2000). *See also Dews*, 231 F.3d at 1021; *Betkerur*, 78 F.3d at 1095.

The Sixth Circuit has made clear that, in order to show pretext, a plaintiff "must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). In other words, a jury may not simply refuse to believe an employer's legitimate, nondiscriminatory reason for its action unless there is sufficient basis in evidence to do so (otherwise, the burden of persuasion would essentially be shifted from the plaintiff to the defendant). *Id*. at 1083. "To make a submissible case on the credibility of [an] employer's explanation, the plaintiff is required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [the adverse action], or (3) that they were *insufficient* to motivate discharge." *Id.* at 1084 (emphasis in original and quotation marks removed) (quoting *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993)). *See also Anthony*, 339 F.3d at 516 (quoting *Manzer*); *Dews*, 231 F.3d at 1021 (citing *Manzer*).

15

1. *Entry Level Supervisory Positions*

As noted above, the plaintiff does not specifically identify those entry level supervisory positions to which he allegedly should have been promoted. Instead he alleges generally that "Hoeganaes has denied him the opportunity to apply and compete for and [sic] all entry level supervisory positions at the Gallatin facility" and that "[t]he clear fact is that supervisory positions were filled and Perry was not allowed to apply and compete." (Docket No. 20 at 3, 8.) Thus, the court concludes that the plaintiff is alleging that the defendant failed to promote him to any and all entry level supervisory positions that became open in the period beginning on June 16, 2000. Even with this guide, the parties have drawn the court's attention to only three such promotions—i.e., those positions filled by Chris Glover, Richard Malone, and Jeff Meador.

Chris Glover, a white employee, was promoted to the position of maintenance supervisor in March 2003. However, as distinguished from the promotions of Malone and Meador, the plaintiff has not discussed Glover's promotion in any materials before the court. The plaintiff did not mention this promotion in his deposition. Glover's promotion is mentioned solely in Reeder's deposition, as one of only three promotions into supervisor positions (along with Malone's and Meador's) made since 2003. (Docket No. 19, Ex. 2, Reeder Dep. at 42.) Although the plaintiff was presumably made aware of Glover's promotion at least as a result of Reeder's deposition, and despite the fact that he admits that Glover was promoted to maintenance supervisor in March 2003 in his response to the defendant's statement of undisputed material facts, the plaintiff does not mention Glover or his promotion at all in his brief. Without even mentioning it, the plaintiff has failed to meet his burden to establish a *prima*

16

*facie* case with respect to this promotion, most particularly by raising a genuine issue of material

fact to show that Perry was qualified for the position of maintenance supervisor or to show that

Glover was a person with similar qualifications who received the promotion (and is outside of

the protected class).

Richard Malone was promoted to the position of supervisor of shipping, effective May 1,

2003.  The plaintiff did not apply for this position, which was not posted.  The defendant asserts

that a plaintiff who cannot establish that he applied for a promotion he seeks cannot make out a

*prima facie* case of discrimination.  (Docket No. 17 at 8.)  This proposition is in error.  In *Dews*

*v. A.B. Dick*, the Sixth Circuit held that, "in failure to promote cases a plaintiff does not have to

establish that he applied for and was considered for the promotion when the employer does not

notify its employees of the available promotion or does not provide a formal mechanism for

expressing interest in the promotion."  *Dews*, 231 F.3d at 1022.  The Court reasoned that, in such

cases, a company had a "duty to consider all those who might reasonably be interested in a

promotion were its availability made generally known."  *Id.*  Although the plaintiff does not refer

to *Dews* or its progeny in his response brief, his argument is on the mark:  "[I]t is the complete

lack of notice and a formalized system for black employees to express interest, apply and

compete that is at issue.  Hoeganaes cannot escape liability by claiming that Perry did not apply

for a position when it is the very fact that he was not allowed to apply that is at issue."  (Docket

No. 20 at 8.)

In this case, without any system of posting available supervisory positions, the defendant

had a duty to consider all those who might reasonably be interested in the supervisor of shipping

promotion were its availability known.  The plaintiff had previously expressed his interest in any

and all entry level supervisor positions to the prior Human Resources Manager, Swarda, in August or September of 2002, of which the supervisor of shipping position was one. Thus, the plaintiff makes a good case for coming within the *Dews* exception, under which he need not show that he applied for, was considered, or was denied the promotion at issue. Nevertheless, the fact that the position was awarded to Richard Malone, another African-American, is fatal to any claim he might have to this promotion, since the plaintiff cannot show that an employee outside his protected class (with similar qualifications) received the promotion when he did not. In fact, it is not entirely clear that the plaintiff is even contending discriminatory treatment in the promotion of Malone, who worked at a different end of the plant from where Perry works. (Docket No. 19, Ex. 1, Perry Dep. at 45.) Instead, the plaintiff attempts to use Malone's promotion during the OFCCP audit as an admission by the defendant that it recognized its prior failure to promote African-Americans and was attempting to cover up its prior inadequacies with a hasty promotion of an African-American. (Docket No. 20 at 8.) Regardless, because of plaintiff's inability to make out the fourth prong of the *prima facie* case, any failure to promote claim that the plaintiff may be asserting with respect to the position given to Richard Malone is unavailing and will be dismissed.

The one promotion that the plaintiff does identify as having been denied him is the Supervisor, Melting position given to Jeff Meador, a white employee, in late May 2003. With respect to this position, plaintiff's failure to apply for the promotion is fatal to his claim. On May 1, 2003, Reeder posted an announcement on six company bulletin boards notifying interested applicants of the Supervisor, Melting vacancy and encouraging qualified applicants to apply. Three employees applied (Docket No. 19, Ex. 2, Reeder Dep. at 84), but Perry was not

18

among them.  When asked why he did not apply for the position, Perry testified that he did not

apply because he was too "[d]iscouraged" to apply because Hoeganaes had "[n]o history of

hiring blacks in those positions."  (Docket No. 19, Ex. 1, Perry Dep. at 44.)[11]  Although he cites

no relevant case law, the plaintiff appears to be seeking an exemption from the application

requirement by arguing that, given the discriminatory nature of promotions at Hoeganaes, his

applying would have been futile.

The Sixth Circuit recognizes such an exemption in a narrow set of cases:  "Although it is

true that failure to apply for a promotion may be excused, the circumstances must reveal

'overwhelming evidence of pervasive discrimination in all aspects of [the employer's] internal

employment practices,  and [that] . . . any application would have been futile and perhaps

foolhardy.'" *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 576 (6th Cir. 2004) (quoting

*Harless v. Duck*, 619 F.2d 611, 617–18 (6th Cir. 1980) *quoted in Kreuzer v. Brown*, 128 F.3d

359, 364 n.2 (6th Cir. 1997)).  The *Bacon* Court concluded that two African-American plaintiffs

claiming a failure to promote, among other adverse actions, "could not come close to meeting

this standard" when other African-Americans had received some of the promotions in question,

one plaintiff's supervisor had expressed a willingness to help him apply, and applying for the

position required only the minimal effort of filling out a form to express interest.  *Bacon*, 370

F.3d at 576.

Similarly, Perry cannot demonstrate that applying would have been futile here.  Although

Charlie Johnson was the only African-American who had previously served as a supervisor,

_____

[11]Plaintiff admits that no Hoeganaes employee ever actively discouraged him, or said or
did anything to discourage him, from applying for any position.  (Docket No. 21 ¶ 18.)

another African-American, Richard Malone, had been promoted to an entry-level supervisor position less than two months before. Moreover, although the plaintiff seeks to characterize the implementation of the Salary Exempt Internal Information Announcement Program as a recognition of the defendant's past inadequacies, the fact that the posting procedure was a new system implemented by a new Human Resources Manager suggests that it would have been just as logical to view it as a positive change. In fact, such a system is the exact type of procedure that the plaintiff had urged the prior Human Resources Manager, Swarda, to adopt to ensure that all hourly employees could have a chance to compete for front line supervisor positions. And as in *Bacon*, interested applicants for the Supervisor, Melting position were merely required to fill out the posted, one-page application form within seven days to be considered for the position.[12] In view of these circumstances, "[i]t is not unreasonable to expect [the] plaintiff[] to make such a minimal effort to preserve [his] rights" as to apply for an open and posted supervisory position. Having failed to expend this effort, plaintiff's claim with respect to the Supervisor, Melting position must fail.

## 2. *Other Positions*

As discussed above, it is not clear to the court whether the plaintiff continues to allege that he was denied promotions to positions other than entry level supervisory positions. The plaintiff states in his brief that, "Hoeganaes denied him the opportunity to apply and compete for

---

[12]Reeder actually testified that the form was a "vehicle to notify us of somebody's interest," but that interested applicants were not required to fill out the application form, and would have been considered had they expressed verbal interest within the seven-day application period as well. (Docket No. 19, Ex. 2, Reeder Dep. at 83–85). The three applicants who were considered for the position all filled out forms. *Id.* at 84.

20

and [sic] all entry level supervisory positions at the Gallatin facility," and that "[t]he clear fact is that supervisory positions were filled and Perry was not allowed to apply and compete." (Docket No. 20 at 3, 7.) Although the plaintiff complains of multiple non-A.O.T. positions for which he was not selected in his Complaint, he does not mention any of them in his response brief, despite the defendant's explicit argument about the circumstances surrounding plaintiff's non-selection for the refractory lead person/brick mason lead person position in February 2002, the atomizer "supervisory trainee" position in late 2002, and the temporary fill-in for brick mason position in January 2003. (Docket No. 17 at 9–12). The fact that the plaintiff affirmatively argues only about entry level supervisory positions in his brief, especially in the face of explicit argument about non-A.O.T. positions by the defendant, suggests that he does not seek to preserve his claims of failure to promote with respect to these three positions. But even if he does, the court concludes that he fails to adduce sufficient evidence to support these claims.

With respect to the two brick mason positions (i.e., the brick mason lead person position in February 2002 and the temporary fill-in for the brick mason position in January 2003), the plaintiff fails to establish a key element of the *prima facie* case. Leaving aside the other elements, plaintiff fails to show that other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied. With respect to whether the plaintiff had similar qualifications to those who were selected for the positions, it is evident that plaintiff did not. He had never held the position of brick mason or brick mason's assistant. The brick mason lead person position was offered only to the three current brick masons in order of their seniority (including one African-American, who accepted and subsequently declined the position). The temporary fill-in for brick

21

mason position was also filled by two employees who were currently brick mason assistants, one of whom was African-American. Without the key qualification of prior brick mason experience, which was possessed by all of the employees who received the positions, and in view of the fact that the positions were offered to other African-American employees, the plaintiff cannot establish a *prima facie* case of discriminatory failure to promote with respect to these positions.

The court will assume without considering, for purposes of argument, that the plaintiff could establish a *prima facie* case with respect to the atomizer "supervisory trainee" position awarded to Mark Cartwright in late 2002. Even if plaintiff could survive this initial burden, he is unable to show that the defendant's legitimate non-discriminatory reason for promoting Cartwright to atomizer supervisory trainee is pretextual. The defendant asserts that, in promoting Cartwright to the supervisory trainee position, it was "attempting to protect the position of the least senior atomizer operator under the unique circumstances of another, more senior, employee unexpectedly returning from a long-term disability leave." (Docket No. 17 at 10.) Cartwright remained in the ad hoc position for three weeks before being "bumped" down to the position of atomizer assistant, following protest from other employees.

The plaintiff admits all of the facts underlying the defendant's proffered legitimate non-discriminatory reason. To establish pretext, then, the plaintiff would need to proceed under the second *Manzer* showing of pretext; that is, to show that the proffered reasons did not actually motivate the promotion by "showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant." *Manzer*, 29 F.3d at 1084. To establish this type of rebuttal showing, a plaintiff "may not rely simply upon his prima facie evidence but must, instead, introduce additional evidence of [] discrimination." *Id.* Having

made no argument whatsoever regarding the atomizer supervisory trainee in his brief—in support of a *prima facie* case or in support of pretext—the plaintiff cannot satisfy this additional burden. Accordingly, any claim of failure to promote that the plaintiff may be asserting with respect to the atomizer supervisory trainee position must be dismissed.

### Conclusion

For the reasons expressed herein, the defendant's Motion for Summary Judgment (Docket No. 16) will be granted and plaintiff's claims dismissed.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

23